UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v.                                                              ) | Criminal No.: 04-10047-RCL |
| ) | |
| LUIS "a/k/a "One Eye" RODRIGUEZ  ) | |
| _____ ) | |

### SENTENCING MEMORANDUM

Defendant, Luis Rodriguez, submits this Sentencing Memorandum to assist the Court in imposing a just and fair sentence in light of the significant health problems he has suffered over the last 19 months since his detention at Plymouth County Correctional Facility ("Plymouth"). As a result of his ongoing health problems, which the BOP and U.S. Marshal's Service have not been able to treat adequately, Mr. Rodriguez requests a sentence of time served, representing 19 months incarceration, and release to, Teen Challenge, an intense, highly-structured Christian facility, for fifteen months. While at Teen Challenge, Mr. Rodriguez can seek treatment in the outside medical community for his health problems.

### PERTINENT FACTUAL BACKGROUND

1. In what would typically be a state court arrest, Mr. Rodriguez was arrested on February 24, 2004 and charged in this Court with one count of distribution of cocaine base under 21 U.S.C. § 841(a)(1). The quantity of cocaine base charged was 1.8 grams and the arrest was a result of a single sale to an undercover agent.

2. Mr. Rodriguez has been detained in federal custody since his arrest on February 24, 2004 and was placed at Plymouth.

3. While at Plymouth, Mr. Rodriguez, who suffered a gunshot blast to his right eye in 1995 and permanently blinded, suffered debilitating headaches on the right side of his head and a number of seizures in which he lost consciousness. Mr. Rodriguez spent the next 15 months requesting Plymouth to find out the cause of the seizures and pain. Because Plymouth did not evaluate or treat Mr. Rodriguez in a timely manner so that the seizures and pain stopped, Mr. Rodriguez petitioned the Court for an order transferring him to FMC, Devens for evaluation and treatment.

4. Mr. Rodriguez remained at Devens for approximately 45 days, was "evaluated" by a doctor, placed on medications and was then released back to Plymouth on or about July 15, 2005. The medical evaluation noted that while he was at Plymouth, he exhibited "loss of breath and consciousness, numbness on the right side of the head, neck, and shoulder, and numbness and blackouts." P. 2 of the July 13, 2005 "Study and Observation." The diagnosis was "(a) asthma, (b) blindness in the right eye secondary to a shot gun blast to the face, ans (c) post traumatic trigeminal neuralgia." Id.

5. Several weeks after his return to Plymouth from Devens, Mr. Rodriguez suffered another seizure notwithstanding the fact that Devens placed him on medication to prevent them. He also continues to suffer from debilitating headaches near his right eye.

6. Mr. Rodriguez has suffered continual pain for the past 19 months with no effective diagnosis having been made. There are a number of bullet fragments lodged in his anterior face, right orbit and neck according to the report by the

doctor from Devens. There is no indication in the report that the doctor evaluated whether there was a link between the "blackouts," numbness, and pain and the bullet fragments still in his head. The report merely concludes that he suffers from "suspected" Post Traumatic Trigeminal Neuralgia. No follow-up evaluation was recommended. An adequate diagnosis has not yet been made as evidenced by the fact that he suffered another seizure after he returned from Devens even though he has been taking the medications prescribed by Devens.

7. Mr. Rodriguez's right eye in which he suffered the gunshot blast has become increasingly smaller since his incarceration and he has not been given any explanation why or how it affects his overall health. Moreover, the doctor at Devens did not evaluate whether there was any connection between the sharp pains in Mr. Rodriguez's head and his seizures even though logic alone would have dictated such an evaluation

8. The PSR calculates a sentence in the range of 188-235 months if a guideline sentence were imposed.[1]

**LEGAL SUPPORT FOR MR. RODRIGUEZ'S
REQUEST FOR A SENTENCE OF TIME SERVED**

**1. This Court Has the Discretion To Depart on Grounds of Extraordinary Physical Impairment.**

This Court possesses the authority to impose a non-guidelines sentence if it so chooses. *U.S. v. Booker,* 160 L. Ed. 2d 621, 125 S. Ct. 738 (2005). If it imposes a non-guidelines sentence, it must follow the dictates set forth in 18 U.S.C. §3553(a), which in pertinent part, requires this Court to ensure that the defendant receives "medical care in the most effective manner." If this Court imposes a guidelines sentence, it also has the

---

[1] Mr. Rodriguez is deemed a career offender in the PSR.

3

authority and discretion to depart downward for Mr. Rodriguez's physical condition. *U.S. v. Martin,* 363 F.3d 25 (1st Cir. 2004); *U.S. v. Derbes,* 369 F. 3d 579 (1st Cir. 2004); *U.S. v. LeBlanc,* 24 F. 3d 340 (1st Cir. 1999); *U.S. v. Ribot,* 97 F. Supp. 2d 74 (D. Mass. 1999); See also 18 U.S.C. § 5H1.4 ("…an extraordinary physical impairment may be a reason to depart downward."). In either event, this Court possesses the discretion and authority to impose a sentence less than 188 months.

The issue we place before this Court is whether it should exercise its discretion based on the facts particularized to Mr. Rodriguez. Our request is for this Court to make a finding that Mr. Rodriguez's health is extremely fragile and he has not been adequately evaluated or treated in the 19 months he has been in custody. As a result, Mr. Rodriguez should be sentenced to time served. Despite BOP's evaluation, Mr. Rodriguez's condition cannot be adequately addressed in a BOP facility as evidenced by the fact that he already suffered another seizure several weeks after BOP allegedly evaluated and treated his condition. At this point and under the circumstances, Mr. Rodriguez should be allowed to seek a proper evaluation and treatment in the outside medical community.

2. **This Court May Depart Downward If It Does Not Believe that the BOP Can Adequately Provide for Defendant's Medical Needs During an Extended Prison Term.**

There is strong case law support in this circuit for a downward departure based on a defendant's physical condition both before and after *Booker*. Two particular cases are instructive and strikingly similar to this one – *U.S. v. Martin,* 363 F. 3d 25 (1st Cir. 2004) and *U.S. v. Pineyro,* 2005 U.S. Dist. LEXIS 9538 (May 18, 2005). Copies of the cases are attached hereto. In both *Martin* and *Pineyro,* a departure was based on the Court's

conclusion that the BOP's knee-jerk assurances that it could treat the defendants was not convincing.

### *a. U.S. v. Martin*

In *Martin,* facts were presented to the court demonstrating that the defendant suffered from Crohn's disease, an illness of the small intestine causing periods of obstruction and abdominal pain. The defendant also suffered from suppression of his immune system as a result of the medication to treat the Crohn's disease. *Martin,* 363 F. 3d at p. 18. The court noted that if the episodes of Crohn's were not treated almost immediately, they could lead to hospitalization and potentially catastrophic surgery. *Id.*

The BOP submitted two letters concluding that it could provide for the defendant's medical condition. The District Court rejected the BOP letters finding that they did not "assure" the court that it could "adequately care for" the defendant. *Martin,* 363 F.3d at p. 19. The First Circuit affirmed the downward departure holding that "we are not convinced that the BOP can adequately provide for Martin's medical needs during an extended prison term." *Id.*

In this case, Mr. Rodriguez is facing an extended prison term. The fact that he suffered from another seizure after having been examined and placed on medication at a BOP facility demonstrates that the BOP cannot adequately assure this Court that it can provide for his medical needs over an extended period of time. The letter issued by the BOP to this Court dated July 13, 2005, a copy of which is attached hereto for the convenience of the Court, demonstrates that the examination and evaluation of Mr. Rodriguez's condition was perfunctory at best and no follow up was recommended. As an example, we point out paragraph (3) in the "Referral Questions and Answers" section

of the BOP letter indicating that it did NOT have ANY of Mr. Rodriguez's medical records from Plymouth County Correctional Facility in reaching its diagnosis and conclusion. The fact that the BOP failed to consider those records in light of the fact that the seizures and headaches occurred on a frequent basis in the 19 months that Mr. Rodriguez was at Plymouth is astounding. It graphically demonstrates the shoddiness of the BOP's examination and of its inability to properly *evaluate* Mr. Rodriguez's condition. How could this Court be assured that the BOP could adequately *treat* Mr. Rodriguez's condition under the circumstances?

In addition, BOP diagnosed the "seizures" as "asthma" and prescribed a typical inhaler. See July 13, 2005 BOP letter. However, when Mr. Rodriguez suffered a seizure after he returned to Plymouth, he took the inhaler medication prescribed by the BOP and still lost consciousness. The fact that he used the medication but suffered the same symptoms that led him to Devens gives rise to a conclusion that the asthma diagnosis may not be the cause of the seizures. Moreover, because bullet fragments remain lodged in his face, neck and right orbit, an examination should have been conducted to determine if there is a link between them and the seizures. Incredibly, the BOP did not conduct such an examination. A proper evaluation of Mr. Rodriguez has not taken place and this Court could not possibly draw a permissible conclusion that it is "assured" that the BOP can adequately diagnose and treat Mr. Rodriguez's medical problems over an extended prison term. Like, Martin, Mr. Rodriguez is entitled to a downward departure before he suffers fatal consequences.

   b. <u>U.S. v. Pineyro</u>

Likewise, in *U.S. v. Pineyro* the District Court also found that the BOP could not adequately provide for defendant's medical needs during an extended prison term. *U.S. v. Pineyro, 2005 LEXIS at p. 4.* The sentence imposed by the Court was time served representing 15 months that the defendant spent in pre-trial detention and representing a departure of 9 levels. In material ways it is quite similar to this case.

The defendant in *Pineyro* suffered from heterotopic ossification, a condition that immobilized his left arm and leg as well as his back and shoulder. His condition was a result of a 1999 car accident. His condition was chronic, just like here, and he experienced debilitating pain, just like Mr. Rodriguez. Because Pineyro's condition was chronic, he required constant monitoring. So does Mr. Rodriguez's condition. The court also found that "[n]ot surprisingly, there are also substantial emotional sequelae to these injuries." *U.S. v. Pineyro, 2005 LEXIS at p. 2.* In this case, Mr. Rodriguez lives in constant fear that he will not regain consciousness after he suffers from one of his seizures and feels like he has no control over his physical well-being. It has caused a concomitant and sustained depression.

Pineyro was detained in Plymouth after his arrest and remained there for 15 months. The court noted that "the account of his fifteen months that Pineyro spent there [Plymouth] – without pain medication, surgery, therapy, or meaningful care – while his condition worsened also had an impact on my ultimate sentencing decision. Pretrial detention, when the defendant is presumed to be innocent, is not supposed to amount to punishment; it was plainly punishment here." *Id.* In this case, we could easily replace the name "Pineyro" with "Rodriguez" because the facts are so cruelly similar.

7

In *Pineyro,* the BOP provided assurances to the court of its treatment of Pineyro's condition. The court rejected those assurances and concluded that the defendant's condition could not adequately be addressed. It held that the defendant's physical condition "plainly warrants a downward departure under U.S.S.G. § 5H1.4. It is: a) a serious and imminent medical threat, b) which would be made worse by incarceration, and/or c) which the Federal Bureau of Prisons cannot adequately treat." *Id.*

The *Pineyro* court also found that the "BOP has not remotely met its burden of showing that it can provide the defendant with the 'needed…medical care, or other correctional treatment *in the most effective manner.*' 18 U.S.C. § 3553(a)(2)(D)." In accordance with *Pineyro* and 18 U.S.C. § 3553(a)(2)(D), Mr. Rodriguez is entitled by statute and by case law to "MEDICAL CARE IN THE MOST EFFECTIVE MANNER." The BOP has not delivered that quality of care to Mr. Rodriguez and has failed to meet its statutory burden.

There is little doubt that if Mr. Rodriguez were sentenced to the 188-235 months directed by the guidelines, it would be tantamount to a life sentence given his medical condition. Such a sentence in light of the fact that he was guilty of selling 1.8 grams of crack to an undercover officer in a one time deal is more harsh than necessary to punish him and to protect the public. Time served after suffering a 19 month nightmare of allegorical proportion is more than sufficient punishment and possibly even cruel and unusual.

    3.   **MR. RODRIGUEZ TURNED TO RELIGION AT PLYMOUTH TO COPE WITH HIS DEBILITATING PAIN AND LOSS OF CONTROL OVER HIS MEDICAL NEEDS.**

It did not take long for Mr. Rodriguez to figure out that his medical fate was not in his own hands but it belonged to Plymouth who exercised its responsibility in a reckless manner. The only control Mr. Rodriguez had was faith. He turned to religion to cope with the unnerving loss of control and his fear of dying in prison. He prays on a daily basis and obsessively reads his Bible. So serious is his faith that he eschewed the World Series last year when the Red Sox won to read his Bible.

He has told his life story and religious conversion to the nation in a radio spot called "Full Pardon" which broadcasts on 200 radio stations nationwide. He has done so in recognition that he has a serious desire to stop a lifetime of criminal activity and become a better person and citizen of this country. One of the most beneficial consequences of his religious conversion is his rehabilitation. He truly wants to be a man who leads a good and law-abiding life.

Chaplain David Robbins has been guiding Mr. Rodriguez in his religious studies and has submitted a letter detailing the serious commitment Mr. Rodriguez has made to improving his life and eschewing his criminal past. A copy of Chaplain Robbins's Letter is attached hereto. The Chaplain has recommended Mr. Rodriguez's participation in the national Teen Challenge program in Brockton. It is an intensive Christian studies program of 15 months duration in which its participants receive religious instruction and job training. It is a highly structured residential program that enjoys a high success rate. There is also follow up release after care programs that Mr. Rodriguez can utilize. A copy of the Mission Statement and Rules of Teen Challenge are attached hereto.

Such a program would be beneficial to Mr. Rodriguez because it will allow him to continue his religious studies and, at the same, time, and probably more importantly,

enable him to seek medical care in the community at large. The Court can direct Probation to monitor Mr. Rodriguez at Teen Challenge and ensure that he is receiving adequate medical treatment as a condition of his release.

## CONCLUSION

There is little doubt that Mr. Rodriguez's health would be materially better if he was released from prison and was able to seek effective and adequate medical treatment in the outside medical community. There is also little doubt that the dictates of 18 U.S.C. § 3553(a) are not being met in that Mr. Rodriguez will not receive the most effective medical care if he remains in BOP's custody. His debilitating headaches, frequent seizures, the bullet fragments still lodged in his eye socket, face and neck, and the material change in the size of his blind eye pose a serious and imminent medical threat which would be made worse by incarceration. The likelihood of Mr. Rodriguez dying in prison given the extensive guideline sentence is disproportionately high. He should be sentenced to time served with the condition that he seek and receive proper medical care.

LUIS RODRIGUEZ

By his attorney,

/s/ Valerie S. Carter
Valerie S. Carter (BBO # 545412)
Carter & Doyle
530 Atlantic Avenue
Boston, MA   02210
617-348-0525
(781) 581-9880

DATED: August 29, 2005

CERTIFICATE OF SERVICE

      I, Valerie S. Carter, Esquire, hereby certify that on August 29, 2005 I served a copy of the above Sentencing Memorandum Peter Levitt, Esquire by email and first class mail.

                                /s/ Valerie S.Carter
                                Valerie S. Carter, Esquire