FOCUS - 22 of 24 DOCUMENTS

UNITED STATES OF AMERICA, v. ROBERT PINEYRO, Defendant.

Docket No. 02-cr-10140-NG

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS

*2005 U.S. Dist. LEXIS 9538*

May 18, 2005, Decided

**LexisNexis(R) Headnotes**

**COUNSEL:** [*1] For Robert Pineyro (1), Defendant: Dawn M. Perlman, Testa, Hurwitz & Thibeault, LLP, Boston, MA; Joseph F. Savage, Jr., Goodwin Procter, LLP, Boston, MA.

For USA, Plaintiff: Dena T. Sacco, United States Attorney's Office, John Joseph Moakley Federal Courthouse, Boston, MA.

**JUDGES:** NANCY GERTNER, United State District Judge.

**OPINIONBY:** NANCY GERTNER

**OPINION:**

**SENTENCING MEMORANDUM**

On April 24, 2002, Robert Pineyro ("Pineyro") was charged with being a felon in possession of a firearm, in violation of *18 U.S.C. § 922(g)(1)*. Initially detained for fifteen months, he was released prior to trial (after an appeal to this Court). n1 After over a year without incident, he pled guilty, and was sentenced.

> n1 He was released on the following conditions:
>
> 1. Reside with third-party custodian, Sandra Pineyro, at 88 Queen Anne's Court, Apartment 32 in Weymouth, Massachusetts.
>
> 2. Submit to electronic monitoring. Permitted to attend medical and legal appointments and religious services with the prior approval of Pretrial Services.
>
> 3. Report to Pretrial Services as directed.
>
> 4. Travel restricted to the District of Massachusetts.
>
> 5. Undergo medical and/or psychiatric treatment if deemed necessary.
>
> 6. Possess no firearms or other dangerous weapons.
>
> 7. Refrain from the use of illegal substances and the excessive use of alcohol.
>
> 8. Undergo random drug testing.
>
> On August 14, 2003, defendant's conditions of release were modified to permit him to live with his sister, Maritza Pineyro, at 75 Stadium Way, Apartment A, in Allston, Massachusetts.

[*2]

The offense is straightforward. Pineyro was found with a .25 caliber revolver and ammunition on or about March 7, 2002. His criminal record -- from over a decade ago -- makes that possession unlawful under *18 U.S.C. § 922(g)(1)*. The Guidelines calculation, likewise

Case 1:04-cr-10047-RCL   Document 43-2   Filed 08/29/2005   Page 2 of 6

Page 2
2005 U.S. Dist. LEXIS 9538, *

straightforward, set an offense level of 21, criminal history III. The sentencing range was 46-57 months.

Pineyro's sentencing took several months, in part because of his complex and rare medical condition. As a result of this condition, defendant moved for a downward departure for extraordinary physical condition under *U.S.S.G. § 5H1.4*, as well as on other grounds. n2

> n2 Defendant moved for a downward departure based on his physical condition, diminished capacity, and criminal history, which allegedly overstated his culpability.

Pineyro suffers from heterotopic ossification ("HO"), a condition that has immobilized his left arm, shoulder, back and left leg. HO is a disease that causes excess bone [*3] growth in the bones that Pineyro broke in a very serious car accident in 1999. As the bone matter expands, Pineyro experiences excruciating pain. The affected areas -- elbow, forearm, shoulder, hip and back -- become stiff, like stone. He is unable to bend or raise the areas in question; he walks with a limp. Since the condition is chronic, the defendant must be carefully monitored. He periodically undergoes radiation and physical therapy and has endured multiple operations to scrape away the excess bone. Because of the pain, Pineyro must be treated with pain medication. Not surprisingly, there are also substantial emotional sequelae to these injuries.

Pineyro's physical condition played an important part in the Court's decision to release him pre-trial. There was no doubt that he could not be adequately treated at the Plymouth House of Correction where he was detained. Indeed, the account of the fifteen months that Pineyro spent there -- without pain medication, surgery, therapy, or meaningful care -- while his condition worsened also had an impact on my ultimate sentencing decision. Pretrial detention, when the defendant is presumed to be innocent, is not supposed to amount to punishment; [*4] it was plainly punishment here.

As soon as Pineyro was released pre-trial, he was immediately placed on an elaborate treatment plan which included a series of surgical procedures, each scheduled a matter of months after the other.

Sentencing was delayed to fully evaluate the nature of Pineyro's condition and whether the Bureau of Prisons ("BOP") was able to provide him with adequate care. The Court took testimony and reviewed extensive medical records and briefs on both sides. The Court also allowed the government's Motion for an Order Directing the Bureau of Prisons to Report on its Ability to Treat the Defendant (docket entry # 62), and granted discovery on the issue for both sides.

Despite the BOP's assurances, which I found to be less than persuasive, I concluded that Pineyro's condition could not be adequately addressed in a BOP facility. The vague promises given by the BOP about what it could do to accommodate Pineyro did not begin to compare with the existing, detailed treatment plan of Pineyro's doctors -- pain medication, psychiatric and physical therapy, and regular surgical interventions.

Significantly, the sentencing process also spanned a sea-change in federal sentencing, [*5] notably the Supreme Court's decision in *United States v. Booker, 160 L. Ed. 2d 621, 125 S. Ct. 738 (2005)*. However, whether the framework for this sentencing was the United States Sentencing Guidelines (based on the requested departures), or the outline set out in Booker (notably, the requirement of "effective" medical treatment, *18 U.S.C. § 3553(a) (2) (D)*), the outcome would have been the same. After reviewing the records and hearing the testimony, I sentenced Pineyro to time served (fifteen months) and three years of Supervised Release with six months of home detention with electronic monitoring. In addition to the usual conditions, I adopted Pineyro's existing treatment plan -- including mental health treatment.

**I. BACKGROUND**

**A. Military Service**

Pineyro served in the military for six years without incident, climbing his way to the rank of Sergeant in the United States Marine Corps. While in the service, he was awarded the National Defense Medal and the Good Conduct Medal. n4

> n4 After withdrawing from college, the defendant went to work for Nynex. He stated that Nynex later transferred him to New York, New York, where he remained until joining the U.S. Marine Corps on November 23, 1985. He was stationed in Palm Springs, California, and at the Naval Air Station in Weymouth, Massachusetts.

[*6]

**B. 1990 Car Accident**

Pineyro was honorably discharged following a May 1990 car accident. While on duty, the defendant was struck by a car as he crossed the street. He suffered head injuries and was hospitalized. He thereafter continued to experience blurred vision, dizziness and tinnitus, which

Case 1:04-cr-10047-RCL   Document 43-2   Filed 08/29/2005   Page 3 of 6

Page 3
2005 U.S. Dist. LEXIS 9538, *

led to his discharge. His life-long plan of being a "military man" was derailed.

### C. Prior Record

Only three months after this accident, in August of 1990, Pineyro committed his first offense. He committed his second offense -- and the last before the current charge -- occurred on May 26, 1991, less than one week after his honorable discharge from the military.

In August of 1990, Pineyro sold a firearm silencer to an undercover agent in New York City, surrendering to federal authorities in January of 1991. While on pretrial release, he was the lookout for two individuals who robbed a Star Market in Quincy. All three were charged with masked armed robbery, multiple counts of assault and firearms, charges. Pineyro received a sentence of seven to ten years at Cedar Junction, followed by a federal sentence of fifteen months. He was finally released to the Coolidge House in [*7] 1996, and was on supervised release until December 15, 1999. He completed his supervision entirely without incident.

Between 1996 and the incident offense in March 2002, Pineyro had no criminal record. He had finally returned home, in close proximity to his family and the relationships he cared about (as described below). He was employed until yet another car accident, this one far more serious, substantially disabled him.

### D. November 1999 Accident

On November 5, 1999, Pineyro was severely injured when he crashed his car into a building in an attempt to swerve around a car which had run a red light. The defendant has no independent memory of the accident; a friend who was with him told him what happened. He suffered a head wound and broke his left shoulder, left humerus, left hip, left leg, and shattered his back. He was taken to Boston Medical Center, where he spent two weeks in the ICU. He was later taken to Health South, a rehabilitation center in Braintree, Massachusetts.

### E. Medical Condition

#### 1. Heterotopic Ossification

Medical records reflect that defendant was admitted to the Boston Medical Center in a coma, with bleeding in his brain and multiple [*8] fractures. After undergoing several operations, and substantial physical therapy, he was discharged almost two months later.

Six weeks after the accident, however, Pineyro was diagnosed with HO, a rare and chronically painful disease which has immobilized his left arm, shoulder, back and left leg. In addition, HO in his spine creates lower back pain which he describes as "virtually unbearable."

He has been treated by a plethora of specialists, one for his elbow, another for his knee, another for his spine. Prior to his detention, he had multiple operations on his left forearm and left elbow. Additional surgery on his left shoulder was scheduled but delayed because of his detention. It was then scheduled immediately after his release in September and was to be followed by hip surgery.

Pineyro requires careful monitoring in order to determine if the HO has started to reform at any of these sites, as it had after his early operations. He requires morphine (60 mg per day), metal bracing, and extensive physical therapy.

#### 2. Mental Condition

Pineyro has also been diagnosed with serious psychological problems deriving from the traumatic brain injury he suffered during the car [*9] accident, as well as his general medical condition. n5 Pineyro has received extensive treatment, both from a psychiatrist, Dr. Pedro Politzer, and a psychologist, Dr. Rebecca Rosenblum. (Both have provided the Court with their records). His diagnosis is an impulse control disorder, most likely resulting from frontal lobe damage, coupled with severe depression. Dr. Rosenblum saw Pineyro weekly for seven months. Her records provide the basis for the defendant's motion for a downward departure based on diminished capacity. n6

---

n5 Indeed, even after the first accident in 1990, Pineyro was seen by a psychologist because "he seemed depressed and the military wanted to determine that he was competent." PSR at P 102.

n6 Dr. Rosenblum wrote that it is "reasonable to conclude that [Mr. Pineyro's] judgment was impaired in the decision he made leading up to the recent weapons charge." See letter dated August 24, 2003, from Dr. Rosenblum (Defendant's Sentencing Memorandum, Tab C).

---

### F. Pre-trial and Post-conviction [*10] Detention

The defendant received no treatment while detained pre-trial at the Plymouth County House of Correction -- surely no surgery, physical therapy, counseling, or pain medication.

And while the BOP has represented that it will be able to address Pineyro's complex medical needs, the record reflects otherwise. In August 2003, the Court received what can only be described as the standard BOP

letter, giving vague assurances that Pineyro would be classified and that the BOP has a trained staff. I was not content with those assurances. n7 See *United States v. Martin, 363 F.3d 25, 50 (1st Cir. 2004)* (court not convinced that the BOP can adequately provide for defendant's medical needs during an extended prison term); *United States v. Gee, 226 F.3d 885, 902 (7th Cir. 2000)* (determination that downward departure for defendant's physical condition was not an abuse of discretion, where district court made decision after considering medical records and the testimony of treating physicians and where letter in which the BOP indicated that it could adequately tend to defendant was merely a form letter trumpeting its ability to handle medical conditions [*11] of all kinds); *United States v. Derbes, 369 F. 3d 579, 582-83 (1st Cir. 2004)* (remanding for justification that departure is appropriate because defendant's imprisonment will prevent adequate treatment).

> n7 Before ordering the BOP to gather more information, I found that the BOP's August 2003 letter was "inadequate on its face." Order dated June 2, 2004 at 2 (docket entry # 62). It could not have been "more general" and "less attuned to the particularities of Pineyro's medical and mental health condition." Id.

Over the defense's opposition, n8 I granted the government's Motion for an Order directing the BOP to conduct a study of the defendant pursuant to *18 U.S.C. § 3552(b)*. n9 I ordered the defendant to share all of his records with the BOP. If the BOP did not find a records review adequate, I would permit Pineyro's physical examination at a facility in Boston. n10 In addition, I ordered that the BOP produce redacted records of inmates with comparable medical conditions [*12] which it had treated.

> n8 The defense noted -- quite rightly -- that the government had been well aware of Pineyro's situation at least a year before it filed the motion, and further, that its motion implicitly recognized the inadequacy of the BOP's August 2003 response. Nevertheless, because of the seriousness of the issue, I agreed to enter an order seeking more information, and delaying the sentencing as a result. The order required that the following questions be answered:
>
>> a) Does the BOP have sufficient records to make a determination about defendant's medical condition without further physical examination?
>>
>> b) If they do not, should any further examination be conducted, and if so, where -- in the community or at a BOP facility?
>>
>> c) What are the standards for determining the adequacy of BOP facilities and how were those standards applied in the case at bar?
>
> n9 *18 U.S.C. § 3552(b)* provides:
>
>> If the court, before or after its receipt of a report specified in subsection (a) or (c) [presentence], desires more information than is otherwise available to it as a basis for determining the sentence to be imposed on a defendant found guilty of a misdemeanor or felony, it may order a study of the defendant.
>>
>> The study shall be conducted in the local community by qualified consultants unless the sentencing judge finds that there is a compelling reason for the study to be done by the Bureau of Prisons. . . .

[*13]

> n10 The government's initial motion sought to institutionalize the defendant in a BOP facility -- likely outside of the Northeast Region -- in order to study him.

On October 7, 2004, I held a sentencing hearing to address the outstanding issues in the case. Dr. John Manenti, a Clinical Specialty Consultant of the Health Services Division of the Bureau of Prisons, testified. He reviewed Pineyro's records and determined that there was no need to actually examine him. He consulted with others at the BOP and concluded "with a reasonable degree of medical certainty that the Bureau of Prisons can provide the necessary and appropriate treatment for Mr. Pineyro." He provided the defense with redacted copies of the records of two other inmates who had HO while incarcerated.

The defendant offered the affidavit of Dr. Michael D. Mason ("Dr. Mason"), an orthopedic surgeon at New England Baptist Hospital who was one of Pineyro's treating physicians. Dr. Mason outlined the treatment plan for Pineyro -- elbow replacement surgery, forearm reconstructive surgery, shoulder and hip surgery, physical therapy two [*14] to three times a week for a month, radiation treatment twice a week (prior to surgery). He opined that further surgeries were likely, including the possibility of total joint replacement and implantation of prosthetic devices.

## II. LEGAL ANALYSIS

I arrived at the identical conclusion concerning Pineyro's sentence whether I analyzed the record under the Guidelines, or under the requirements of Booker. Accordingly, rather than proceeding with a Guidelines analysis first, and then evaluating the Guidelines outcome by the statutory requirements, I will discuss both frameworks at the same time.

### A. Extraordinary Physical Impairment/Requirements of 18 U.S.C. § 3553(a) (2) (D)

Pineyro's physical condition plainly warrants a downward departure under *U.S.S.G. § 5H1.4*. It is: a) a serious and imminent medical threat, b) which would be made worse by incarceration, and/or c) which the Federal Bureau of Prisons cannot adequately treat. See *United States v. Baron, 914 F. Supp. 660, 662-63 (D. Mass. 1995)*.

The BOP has not remotely met its burden of showing that it can provide the defendant with [*15] "needed . . . medical care, or other correctional treatment *in the most effective manner*." *18 U.S.C. § 3553(a) (2) (D)* (italics supplied). It offered no treatment plan whatsoever and surely nothing comparable to what Pineyro is presently receiving. n11 Its conclusion that it can provide the "necessary and appropriate treatment" is not only vague, it does not meet the statutory requirements (that Pineyro receive "the most effective" treatment).

> n11 The two inmates that the BOP offered to demonstrate its capacity to deal with this condition are not comparable. Neither has received surgery.

### B. Diminished Capacity

A downward departure is also justified under *U.S.S.G. § 5K2.13* because of Pineyro's diminished capacity deriving from the frontal lobe damage he suffered in the 1999 motor vehicle accident. Plainly, his significantly reduced mental capacity contributed to some degree to the commission of the instant offense -- his first in nearly 12 [*16] years. See *United States v. Shore, 143 F. Supp. 2d 74, 80 (D. Mass. 2001)*. Under *U.S.S.G. § 5K2.13*, "'significantly reduced mental capacity'" means that the defendant has "'a significantly impaired ability to . . . control behavior that the defendant knows is wrongful.'" Id. (quoting *U.S.S.G. § 5K2.13, cmt. n. 1*). Dr. Rosenblum's diagnosis of the defendant fits within this category.

### C. Criminal History

*Section 4A1.3 of the Sentencing Guidelines* empowers the Court to grant a downward departure where a defendant's criminal history category "substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes." *U.S.S.G. § 4A1.3(b) (1)*. Moreover, under 18 U.S.S.G. § 3553(a) (2) (C) the Court is expressly to consider a sentence designed "to protect the public from further crimes of the defendant."

In the instant case, I do not agree with defense counsel that category III overstates defendant's criminal history; the defendant's convictions, though 12 years old, were for serious offenses. [*17] At the same time, I do agree that the criminal history category does not reflect the likelihood that the defendant will commit further crimes. His worsening physical condition, the demands of his treatment, and his new family obligations are more than likely to affect his future conduct.

### D. Other Factors

Pineyro has a strong family surrounding him. Especially noteworthy is his relationship with Rameika Boyd ("Rameika"). Pineyro has treated Rameika as if she were his own daughter since her birth. In 1996, he obtained a paternity test which revealed that he is not her biological father. Significantly, he has continued to provide Rameika with financial support, and more importantly, has maintained a close relationship with her. Indeed, Rameika's letter about her "dad" was among the most poignant that the Court has ever received. n12

> n12 Rameika's mother ("Ms. Boyd") sought a restraining order against Pineyro after the paternity test results became known. It was not the usual restraining order -- to stop someone from verbally abusing or physically harassing them. Ms. Boyd sought to prevent Pineyro from seeing Rameika because she did not want Rameika to refer to him as "dad," or to be close to him in any way. She alleged that Pineyro

"harbored" Rameika, apparently during the time when he was hospitalized and hardly able to harbor anyone. The order expired in December 2001.

An earlier restraining order against the defendant was obtained by Karen Willis ("Ms. Willis") in March 1997. The order expired two months later without incident. Defendant reported that he had been contacting Ms. Willis, with whom he had been romantically involved, to obtain payment of a $ 500 judgment he had obtained in small claims court.

[*18]

In addition, Pineyro and his long-term girlfriend, Gloria Rodriguez, recently had a child together.

### III. SENTENCE

A sentence within the Guidelines range -- indeed any sentence of imprisonment beyond what Pineyro has already received -- would substantially disrupt an existing, elaborate and required medical treatment plan for Pineyro's HO, wholly without justification. The purposes of sentencing under *18 U.S.C. § 3553(a)* can be met by a sentence of 15 months (which equals "time served"). While it requires a departure of nine levels (to a level 12), it is justified. Only a non-jail disposition would be consistent with the rationale of the various departure provisions in the Guidelines and the underlying statute. See *United States v. Ribot, 97 F. Supp. 2d 74, 84 (D. Mass. 1999)* (downward departure of seven levels justified to preserve treatment plan). Pineyro has been punished for his serious offense; the punishment is both proportionate to his offense and to his individual situation.

**SO ORDERED.**

Date: May 18, 2005

**NANCY GERTNER, U.S.D.J.**