LEXSEE 363 F3D 25

**UNITED STATES OF AMERICA, Appellant, v. DANIEL MARTIN, Defendant, Appellee.**

No. 03-1068

UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

*363 F.3d 25; 2004 U.S. App. LEXIS 5847; 93 A.F.T.R.2d (RIA) 1553*

**March 30, 2004, Decided**

**PRIOR HISTORY:** [**1] APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS. Hon. Robert E. Keeton, U.S. Senior District Judge.

**DISPOSITION:** Sentence vacated; remanded.

**LexisNexis(R) Headnotes**

**COUNSEL:** Diane C. Freniere, Assistant United States Attorney, with whom Michael J. Sullivan, United States Attorney, was on brief, for appellant.

Max D. Stern for appellee.

**JUDGES:** Before Lipez, Circuit Judge, Campbell, Senior Circuit Judge, and Howard, Circuit Judge.

**OPINIONBY:** LIPEZ

**OPINION:**

   [*30]  LIPEZ, Circuit Judge. Defendant Daniel Martin pleaded guilty to fraud and tax evasion. The district court sentenced him to three years of probation, with six months to be served in home detention. The government, believing that Martin's sentence was too lenient, appeals. It argues that the district court improperly grouped the fraud counts with the tax evasion counts and improperly granted downward departures for extraordinary acceptance of responsibility and extraordinary physical impairment. Martin counters that, because he has already served a significant portion of his original sentence of probation, any subsequent sentence of imprisonment would violate double jeopardy principles.

   Although we disagree with Martin's double jeopardy argument as posed, this case does raise [**2] a double jeopardy issue that must be addressed at re-sentencing. There will be a re-sentencing because we agree with the government that the court erred in its grouping decision and its grant of a downward departure for extraordinary acceptance of responsibility.

   I.

   From 1997 until 2000, Martin participated in a scheme to defraud several food distributors and the DeMoulas Supermarkets chain of more than $ 1.8 million. In the food merchandise industry, food distributors often pay grocers to run promotional campaigns for their products or place their products in preferred display locations. These transactions are negotiated almost entirely between representatives of the food distributors and the grocer, with little supervision by higher level executives. Thus, only the representatives know if a distributor pays more, or a grocer receives less, than the negotiated price. A representative could easily divert funds [*31] by lying to his or her supervisors about the actual terms of a contract.

   Martin and his fellow conspirators took advantage of this lack of oversight. Robert Stella, a salesman for the food distributor Campbell's, stole more than $ 800,000 in checks written to DeMoulas. Robert [**3] McCarthy, a food broker for Advantage ESM, similarly stole checks destined for DeMoulas worth approximately $ 490,000. Finally, Wayne Dick, a food buyer at DeMoulas, took more than $ 400,000 worth of checks given to him by various food distributors as payment to DeMoulas. Stella, McCarthy, and Dick gave their stolen checks to Martin so he could deposit them at Fleet Bank where Linda Dempski, a teller who was a party to the scheme,

would convert the proceeds to cash or cashiers checks. Thus, Martin served primarily as a middleman, taking the stolen checks and converting them to cash through his contacts at Fleet.

All told, Martin converted $ 1,803,990 in checks made out to DeMoulas. Martin's share of that sum was between $ 582,335 and $ 660,623. n1 Martin did not report this fraudulent income, and the resulting tax loss to the government was approximately $ 254,500.

> n1 At sentencing, the government contended that Martin received between 50 and 60 percent of the value of each check and that, while the exact amount that Martin received could not be ascertained with precision, it was at least the $ 660,623 stated in the presentence report. Although he did not object to the figure in the presentence report, Martin claimed that he always received less than half of the proceeds from each check and received a total of only $ 582,335. Which figure is correct is not relevant to our discussion of the issues in this case.

[**4]

In May 2000, a Fleet Bank official noticed a DeMoulas check deposited directly into Martin's personal account. From there, the scheme unraveled quickly. DeMoulas confronted Dick about the thefts and, soon after, Dick, Stella, and Martin contacted DeMoulas about paying restitution. Over the next five and a half months the three paid a total of $ 1,746,930 to the victims, representing the total known loss as of December 2000. n2 Martin contributed $ 837,491 to DeMoulas's and Campbell's losses, and $ 11,000 toward Fleet's attorneys' fees, for a total of $ 848,491.

> n2 Dempski and McCarthy, who served as government witnesses, did not contribute to this sum. Approximately two years later, the government discovered that an additional $ 57,060 had been stolen from DeMoulas during the course of the scheme, raising the final total to $ 1,803,990. McCarthy agreed to pay the additional $ 57,060 as part of his plea agreement.

II.

On July 26, 2002, Martin waived indictment and pleaded guilty to an information charging him [**5] with nine counts of "receipt of stolen moneys" in violation of *18 U.S.C. § 2315* (the "fraud counts") and two counts of filing a materially false U.S. income tax return in violation of *26 U.S.C. § 7206(1)* (the "tax evasion counts"). There was no plea agreement.

On November 21, 2002, the district court began a three day sentencing hearing. The government argued primarily that Martin was the central figure in the scheme, had recruited the other participants, and was the organizer and leader of the criminal activity. To support this view, the government offered three cooperating witnesses--McCarthy, Stella, and Dempski--who testified about Martin's role in the scheme. The government further argued that, because Martin denied that he was the central figure in the conspiracy, the court should not grant any [*32] downward adjustment for acceptance of responsibility.

The defense offered evidence of Martin's restitution payments and his history of physical problems resulting from Crohn's disease. It argued that Martin's restitution payments were so extraordinary that they justified a departure above and beyond the normal adjustment for acceptance [**6] of responsibility recognized in the Guidelines. It further argued that Martin's fragile health justified a departure based on the discouraged factor of extraordinary physical impairment.

Finding the government witnesses unconvincing, the court stated that the scheme, while involving several people working in concert, was a disorganized assemblage of members concerned primarily with their own interests. Although Martin may have served as a middleman in the execution of the scheme, the court did not find that he played a central role as a leader or an organizer.

Against this backdrop, the court first calculated the sentence for the fraud counts. n3 Applying *U.S.S.G. § 2B1.1(a)*, it set the base offense level ("BOL") at four. It added a 14 level enhancement, pursuant to *U.S.S.G. § 2B1.1(b)(1)(O)*, because the amount of stolen money was between $ 1.5 million and $ 2.5 million. n4 It further added a two level enhancement under *U.S.S.G. § 2B1.1(b)(4)(A)* for more than minimal planning. n5 This resulted in an adjusted offense level ("AOL") of 20 for the fraud counts.

> n3 All references to the Sentencing Guidelines are to the November 1998 edition. Normally, we apply the edition in effect at the time of sentencing. See *United States v. Harotunian, 920 F.2d 1040, 1041-1042 (1st Cir. 1990)*("Barring any *ex post facto* problem, a defendant is to be punished according to the guidelines in effect at the time of sentencing."). However, at the time Martin committed his offenses, the Guidelines indicated an offense

level of 18 pursuant to § 2B1.1. Editions published after the amendments of November 2001 indicate an offense level of 22 under that section. "Because imposition of the amended guidelines would have resulted in a higher BOL, and thus raised *ex post facto* concerns," we apply the Guidelines in effect at the time that Martin committed his offenses. *Id. at 1042*. [**7]

n4 *U.S.S.G. § 2B1.1* provides in part:

| Loss (Apply the Greatest) | Increase in Level |
|---|---|
| . . . . | |
| More than $ 1,500,000 | add 14 |
| More than $ 2,500,000 | add 15 |
| . . . . | |

n5 *U.S.S.G. § 2B1.1(b)(4)(A)* provides: "If the offense involved more than minimal planning, increase [the offense level] by 2 levels. . . ."

For the tax evasion counts, the court applied *U.S.S.G. § 2T1.1(a)(1)*. Pursuant to *U.S.S.G. § 2T4.1(K)*, it set the BOL at 16 because the tax loss was between $ 200,000 and $ 325,000. n6 It then added a two point enhancement under *U.S.S.G. § 2T1.1(b)(1)* for failing to report income in excess of $ 10,000 derived from criminal activity. n7 Thus, the AOL for the tax evasion counts was 18.

[**8]

n7 *U.S.S.G. § 2T1.1* provides in part:

(b) Specific Offense Characteristics

(1) If the defendant failed to report or correctly identify the source of

(a) Base Offense Level: 4

(b) Specific Offense Characteristics

(1) If the loss exceeded $ 100, increase the offense level as follows:

n6 *U.S.S.G. § 2T1.1* provides in part:

(a) Base Offense Level:

(1) Level from *§ 2T4.1* (Tax Table) corresponding to the tax loss; or
(2) 6, if there is no tax loss.

Because there was a tax loss of $ 254,500, the court set the BOL according to the tax table in *§ 2T4.1*, which provides:

| Tax Loss (Apply the Greatest | Offense Level |
|---|---|
| . . . . | |
| (K) More than $ 200,000 | 16 |
| (L) More than $ 325,000 | 17 |
| . . . . | |

income exceeding $ 10,000 in any year from criminal activity, increase by 2 levels. If the resulting offense level is less than level 12, increase to level 12.

[*33] The court found that the fraud counts embodied the same conduct that justified the two level upward adjustment to the tax evasion counts for failure to report criminally derived income. Thus, the court

ruled that the fraud and tax evasion counts should be grouped pursuant to *U.S.S.G. § 3D1.2(c)*.n8 Applying *U.S.S.G. § 3D1.3*, the court set the grouped offense level at 20--the highest offense level of the counts in the group (the fraud counts). n9 The court then applied a three point reduction for acceptance of responsibility pursuant to *U.S.S.G. § 3E1.1*, reducing the AOL to 17. If the court had ended its sentencing analysis there, the sentencing range would have been 24-30 months. n10

> n8 *U.S.S.G. § 3D1.2* provides:
>
>> All counts involving substantially the same harm shall be grouped together into a single Group. Counts involve substantially the same harm within the meaning of this rule:
>>
>> . . .
>>
>> (c) When one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts.
>>
>> (d) When the offense level is determined largely on the basis of the total amount of harm or loss, the quantity of a substance involved, or some other measure of aggregate harm, of if the offense behavior is ongoing or continuous in nature and the offense guideline is written to cover such behavior. . . .

[**9]

> n9 *U.S.S.G. § 3D1.3* provides:
>
>> Determine the offense level applicable to each of the Groups as follows:
>>
>>> (a) In the case of counts grouped together pursuant to *§ 3D1.2(a)-(c)*, the offense level applicable to a Group is the offense level, determined in accordance with Chapter Two and Parts A, B, and C of Chapter Three, for the most serious of the counts comprising the Group, i.e., the highest offense level of the counts in the Group.
>
> n10 This guideline range applies to defendants, like Martin, who have a Criminal History Category of I.

Instead, the court made two downward departures from the AOL. First, it made a four point downward departure for extraordinary acceptance of responsibility. The court made this departure primarily because Martin had repaid his share of the stolen money, had contributed to paying McCarthy's share, and had contributed to both DeMoulas's and Fleet Bank's attorneys' fees. Second, the court made an additional three point downward departure for Martin's "exceptional physical impairments" caused by Crohn's disease and a variety of other [**10] ailments. The resulting AOL of 10 put Martin in Zone B of the Sentencing Table, with a guideline range of 6-12 months. The court applied *U.S.S.G. § 5B1.1(a)(2)* and *§ 5C1.1(e)(3)* to sentence Martin to three years probation, six months to be served as home detention in lieu of imprisonment, and a $ 1,100 special assessment. n11

> n11 *U.S.S.G. § 5B1.1* provides:
>
>> (a) Subject to the statutory restrictions in subsection (b) below, a sentence of probation is authorized if:

> . . .
>
> > (2) the applicable guideline range is in Zone B of the Sentencing Table and the court imposes a condition or combination of conditions requiring intermittent confinement, community confinement, or home detention as provided in subsection (c)(3) of § 5C1.1 (Imposition of a Term of Imprisonment). . . .

*U.S.S.G § 5C1.1* provides:

> . . .
>
> (c) If the applicable guideline range is in Zone B of the Sentencing Table, the minimum term may be satisfied by --
>
> > . . .
> >
> > (3) a sentence of probation that includes a condition or combination of conditions that substitute intermittent confinement, community confinement, or home detention for imprisonment according to the schedule in subsection (e).
>
> . . .
>
> (e) Schedule of Substitute Punishments

> > . . .
> >
> > (3) One day of home detention for one day of imprisonment. . . .

[**11] [*34]

The government now brings this appeal pursuant to *18 U.S.C. § 3742(b)*. First, the government argues that the district court erred in grouping the tax evasion and fraud counts. Next, it argues that the four level downward departure for extraordinary acceptance of responsibility was unwarranted. Finally, it argues that the three level downward departure for extraordinary physical impairment was likewise unwarranted. Before reaching these issues, we must address Martin's contention that double jeopardy principles preclude any sentence of imprisonment after this appeal. n12

> n12 Prior to oral argument, Martin submitted a motion to dismiss this appeal for lack of jurisdiction. He argued that the *Double Jeopardy Clause of the Fifth Amendment* prohibits us from altering his sentence from one of probation to one of incarceration, and that we should therefore dismiss this appeal insofar as the government sought a term of imprisonment. Even if we agreed with Martin that the *Double Jeopardy Clause* prohibits imposing a term of imprisonment, that conclusion would not affect our jurisdiction to hear this appeal, which is securely provided by statute. See *28 U.S.C. § 1291*; *18 U.S.C. § 3742(b)*. Martin's double jeopardy argument questions the constraints that the Constitution places on our sentencing authority, not our jurisdiction. We therefore address Martin's double jeopardy claim on its merits rather than as an initial matter of jurisdiction.

[**12]

III.

At the time of this opinion, Martin has served approximately 15 months of his three year term of probation, including the six month portion of that term served in home detention. n13 Martin contends that, because probation and imprisonment are alternative punishments under the sentencing statutes, he cannot be forced to serve both kinds of punishment, even if the initial imposition of probation rather than imprisonment was in error. He offers two related yet separate

arguments in support of this position. First, he argues that imposing a term of imprisonment after an appeal would cause him to serve two punishments--first probation and then imprisonment--in violation of the relevant statutes that authorize the court to impose only one form of punishment or the other. Second, even if there is no statutory bar to a sentence of imprisonment after a successful appeal by the government, Martin argues that constitutional double jeopardy principles require the court to credit any time he has already served on probation against any imprisonment imposed after an appeal. Because probation and imprisonment are distinct forms of punishment, Martin contends that crediting probation against [**13] imprisonment is not permissible, and thus the court cannot reconcile his time served on probation with a new sentence of imprisonment. We examine these arguments in turn.

n13 Home detention is a condition placed on a six month portion of Martin's three year probationary term. See *18 U.S.C. § 3563(b)(19)*; *U.S.S.G. § 5C1.1(c)(3)*.

A. Statutory Constraints

Martin concedes our authority to increase a sentence on appeal. See *DeWitt v. Ventetoulo, 6 F.3d 32, 34 (1st Cir. 1993)* ("The Constitution contains no general rule that prohibits a court from increasing an earlier sentence where the court finds that it was erroneous and that a higher sentence was required by law."). Nevertheless, he argues that the relevant sentencing statutes prevent the imposition of a term of imprisonment after an erroneous sentence of probation. He rests his argument primarily on *Ex Parte Lange, 85 U.S. (18 Wall.) 163, 21 L. Ed. 872 (1874)*, [*35] and *In re Bradley, 318 U.S. 50, 87 L. Ed. 608, 63 S. Ct. 470 (1943)*, [**14] two cases in which the Supreme Court determined that a district court may not impose both a fine and a term of imprisonment where the statute authorizes the court to impose only one or the other. The Supreme Court has more recently described these cases as standing for the proposition that "a defendant may not receive a greater sentence than the legislature has authorized." *United States v. DiFrancesco, 449 U.S. 117, 139, 66 L. Ed. 2d 328, 101 S. Ct. 426 (1980)*. In this case, Martin argues that the relevant sentencing statutes--*18 U.S.C. § 3551(b)* and *§ 3561*--explicitly prevent imposition of both probation and imprisonment. n14 Because he has already served a portion of his probationary term, Martin argues that imposing an additional term of imprisonment would exceed the authority provided by the sentencing statutes. We disagree.

n14 Martin does not contend that the statutes governing his offenses of conviction--fraud and tax evasion--explicitly prohibit a sentence that includes both probation and a term of imprisonment. The statute governing receipt of stolen money, *18 U.S.C. § 2315*, authorizes a term of imprisonment up to 10 years, a fine, or both. The statute governing tax evasion, *26 U.S.C. § 7206(1)*, authorizes a term of imprisonment up to 3 years, a fine of up to $ 100,000, or both. Pursuant to *18 U.S.C. § 3551(b)*, each of these violations of federal law is also subject to punishment by probation.

[**15]

*Section 3551(b)* states: "An individual found guilty of an offense shall be sentenced . . . to -- (1) a term of probation . . .; (2) a fine . . .; *or* (3) a term of imprisonment. . . ." (emphasis added). Thus, the statute provides a choice among three alternative punishments. n15 If a court chooses to impose probation, it does so pursuant to the terms of *§ 3561*. That section prohibits imposition of probation when "the defendant is sentenced *at the same time* to a term of imprisonment" (emphasis added), further emphasizing the alternative nature of incarceration and probation in any one sentencing decision. n16 Thus, both *§ 3551(b)* and *§ 3561* require a district court to choose between probation and imprisonment when imposing its original sentence. n17 However, the companion sentencing statutes explicitly recognize that a sentence of probation is subject to appeal and may be corrected if erroneous. See *18 U.S.C. § 3562* ("[A] sentence of probation can subsequently be . . . appealed and modified, if outside the guideline range, pursuant to the provisions of *section 3742*. . . ."). *Section 3742* in turn provides for sentencing on remand within the [*36] proper [**16] guideline range. n18 Thus, the sentencing statutes explicitly provide for the appeal and modification of probationary sentences that, like the sentence in this case, fall outside the guideline sentencing range.

n15 In addition to listing fines as one alternative punishment, the statute explicitly states that "[a] sentence to pay a fine may be imposed in addition to any other sentence." *18 U.S.C. § 3551(b)*.

n16 *18 U.S.C. § 3561* governs imposition of probation pursuant to the *Sentencing Reform Act of 1984*. It provides:

(a) In general. A defendant who has been found guilty of an offense may be sentenced to a term of probation unless--

. . .

(3) the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense. . . .

n17 Federal law treats a punishment of "probation" differently than it treats a punishment of "supervised release." "Probation" is an alternative punishment to incarceration. *18 U.S.C. § 3561(a)*. "Supervised release" is a punishment in addition to incarceration, served after completion of a prison term. *18 U.S.C. § 3583*. See also *United States v. Mandarelli, 982 F.2d 11, 12 (1st Cir. 1992)*(describing the difference between "probation" and "supervised release"). [**17]

n18 *18 U.S.C. § 3742(g)* was amended by the PROTECT Act on April 30, 2003. As a procedural change, the amended version applies to all cases pending on that date, including this case. See infra Part V.B. *Section 3742(g)* provides:

Sentencing upon remand. A district court to which a case is remanded pursuant to subsection (f)(1) or (f)(2) shall resentence a defendant in accordance with *section 3553* and with such instructions as may have been given by the court of appeals, except that--

(1) In determining the range referred to in subsection 3553(a)(4), the court shall apply the guidelines issued by the Sentencing Commission pursuant to *section 994(a)(1)* of title 28, United States Code, and that were in effect on the date of the previous sentencing of the defendant prior to the appeal, together with any amendments thereto by any act of Congress that was in effect on such date; and (2) The court shall not impose a sentence outside the applicable guidelines range except upon a ground that--

(A) was specifically and affirmatively included in the written statement of reasons required by *section 3553(c)* in connection with the previous sentencing of the defendant prior to the appeal; and (B) was held by the court of appeals, in remanding the case, to be a permissible ground of departure.

[**18]

Because the Guidelines authorize a punishment of probation only under limited circumstances, the directive in § 3742 to resentence within the guideline sentencing range necessarily includes the possibility that a defendant originally sentenced to probation will, after appeal, receive a sentence of imprisonment. A successful appeal by the government may increase the defendant's offense level, and thus place him in a higher sentencing "zone." See *U.S.S.G. Ch. 5 Pt. A*. As defendants move from the shorter sentencing ranges in Zone A to the progressively longer ranges in Zones B, C and D, they also lose the

possibility of probation as a punishment. In Zone A, a court may impose a probationary sentence and no term of imprisonment. *U.S.S.G. § 5C1.1(b)*. In Zone B, the court may satisfy the minimum term of the guideline sentencing range by imposing a term of imprisonment or a sentence of probation that includes a period of community confinement or home detention. *U.S.S.G. § 5C1.1(c)*. In Zone C, half the term indicated by the guideline range must be served in prison while the other half may be served as supervised release with a condition that substitutes community confinement or home [**19] detention. *U.S.S.G. § 5C1.1(d)* In Zone D, the minimum term must be served in prison. *U.S.S.G. § 5C1.1(f)*. This structure requires that a decision on appeal overturning a downward departure will sometimes move the defendant into a higher sentencing zone, thereby affecting the availability of a probationary sentence.

In this case, Martin would have been in Zone D (making a prison sentence mandatory) but for the departures moving him down to Zone B (allowing probation served under home detention as an alternative to imprisonment). Overturning any one of the district court's departures would move him into Zone D and require a sentence of imprisonment. n19 Although *§ 3551* lists imprisonment and probation as alternative sentences, the Guidelines allow an erroneous [*37] term of probation to be replaced by a term of imprisonment if the correct sentencing "zone" requires it. Thus, imposing a term of imprisonment after the government's appeal from a sentence of probation does not exceed the authority granted to the courts by the sentencing statutes.

---

n19 The district court sentenced Martin based on an AOL of 10 which, combined with a Criminal History Category of I, places him in Zone B. The court's smallest downward departure was three levels, meaning that overturning even the smallest departure would increase Martin's AOL to 13. This would place him in Zone D, requiring a term of imprisonment within the specified guideline sentencing range. See *U.S.S.G. § 5C1.1(e)*.

---

[**20]

B. Double Jeopardy Constraints

The *Double Jeopardy Clause* "absolutely requires that punishment already exacted must be fully 'credited' in imposing a sentence upon a new conviction for the same offense." *North Carolina v. Pearce, 395 U.S. 711, 718-19, 23 L. Ed. 2d 656, 89 S. Ct. 2072 (1969)*. See also *Jones v. Thomas, 491 U.S. 376, 381-82, 105 L. Ed. 2d 322, 109 S. Ct. 2522 (1989)*(holding that crediting time already served against the final sentence fully vindicates the defendant's double jeopardy rights). This crediting principle applies equally to a new sentence imposed for the same conviction after a government appeal. See *Pearce, 395 U.S. at 718* (stating that the protection against double punishment is violated "whenever punishment already endured is not fully subtracted from any new sentence imposed"); *United States v. Bogdan, 302 F.3d 12, 17 (1st Cir. 2002)* (remanding after government appeal for resentencing within the guideline sentencing range subject to credit for time already served); *United States v. McMillen, 917 F.2d 773, 777 (3d Cir. 1990)* (holding that defendant must be given full credit for time served when resentenced [**21] after successful government appeal). It also applies to sentences of probation which, although not as harsh as imprisonment, are nonetheless "punishments" imposed for the offenses of conviction. See *Korematsu v. United States, 319 U.S. 432, 435, 87 L. Ed. 1497, 63 S. Ct. 1124 (1943)*("[A] probation order is 'an authorized mode of mild and ambulatory punishment. . . .'"); *United States v. Bynoe, 562 F.2d 126, 128 (1st Cir. 1977)*("Probation is nonetheless a punishment imposed on the defendant, albeit a mild one.") Thus, because the sentence of probation is "a punishment already exacted" for Martin's offense, it must be credited against a new sentence of imprisonment imposed after an appeal.

Despite this precedent, both parties anticipate that the Bureau of Prisons (BOP) would not give Martin credit for time served on probation, even under the condition of home detention, against a new sentence of imprisonment. If this anticipation is accurate, the BOP appears to have based its policy on the Supreme Court's decision in *Reno v. Koray, 515 U.S. 50, 132 L. Ed. 2d 46, 115 S. Ct. 2021 (1995)*. See U.S. Dept. of Justice, Bureau of Prisons Program Statement No. 5880.28, [**22] p. 1-14H (Jun. 19, 1999)("Under Koray, a defendant is not entitled to any time credit off the subsequent sentence, regardless of the severity or degree of restrictions, if such release was ... a condition of parole, probation or supervised release.").

In Koray, the defendant pleaded guilty to money laundering. While awaiting his sentence, he was released on bail with the condition that he be confined to a community center. He remained at the community center for approximately five months before beginning his 41 month sentence of imprisonment. The BOP refused to grant him credit for the five months spent at the community center because that time was not "official detention" within the meaning of *18 U.S.C. § 3585(b)*, which governs crediting of time served against federal prison sentences. n20

n20 *18 U.S.C. § 3585(b)* provides:

Credit for prior custody. A defendant shall be given credit toward the service of a term of imprisonment for any time he has spent in official detention prior to the date the sentence commences--

(1) as a result of the offense for which the sentence was imposed; or

(2) as a result of any other charge for which the defendant was arrested after the commission of the offense for which the sentence was imposed;

that has not been credited against another sentence.

[**23]

[*38]   The Supreme Court agreed with the BOP, finding that the term "official detention" in *18 U.S.C. § 3585(b)* did not include time served in a community center while on bail awaiting a final sentence. However, the Court emphasized that *§ 3585(b)* only governs credit for *presentence* confinement. *Koray, 515 U.S. at 56* ("*Section 3585(b)* provides credit for time 'spent in official detention *prior to the date the sentence commences*,' ... thus making clear that credit is awarded only for *presentence* restraints on liberty.") (emphasis in the original). It also distinguished between crediting time served while a defendant is "released" on bail and crediting time served after a defendant is "detained" or "sentenced." *Koray, 515 U.S. at 58*. Thus, Koray only addressed the limits of *18 U.S.C. § 3585(b)*, and did not address the double jeopardy implications of crediting time served on probation, supervised release, or other punishments imposed as an initial, albeit erroneous, sentence. n21 See *Koray, 515 U.S. at 55 n.2* ("Our task is strictly one of statutory interpretation.").

n21 Similarly, our decision in *United States v. Zackular, 945 F.2d 423, 425 (1st Cir. 1991)*, held that time spent in home detention while awaiting the start of a prison term should not be credited against that prison term. It did not address whether the *Double Jeopardy Clause* requires crediting of time served on an erroneous sentence.

[**24]

Martin argues that, even if *§ 3585(b)* does not apply to this case, the Supreme Court's double jeopardy jurisprudence prevents us from crediting time served on probation against a term of imprisonment. He cites *Jones v. Thomas, 491 U.S. 376, 384, 105 L. Ed. 2d 322, 109 S. Ct. 2522 (1989)*, in which the Supreme Court noted that "the alternative sentences in Bradley . . . were of a different type, fine and imprisonment. . . . It would not have been possible to 'credit' a fine against time in prison. . . ."

This impossibility of crediting does not apply to the alternative sentences of probation, including home detention, and imprisonment. Although probation and imprisonment are different types of sentences, each restricts a defendant's liberty (albeit to varying degrees) over a specific period of time, allowing the sentencing court to compare the degree and length of restriction when determining the proper amount of credit. Hence, we join other courts of appeals in holding that these similarities are sufficient to allow crediting of probation against imprisonment. See *United States v. Carpenter, 320 F.3d 334, 345 (2d Cir. 2003)* (instructing the district court on [**25]  remand to credit time served on probation against a new sentence of imprisonment); *United States v. Miller, 991 F.2d 552, 554 (9th Cir. 1993)* (same); see also *United States v. Lominac, 144 F.3d 308, 318 (4th Cir. 1998)*(holding that a court may credit time erroneously served on supervised release against a new sentence of imprisonment because both punishments restrict the defendant's freedom over a period of time).

C. Accounting for Time Served on Probation

Having determined that Martin must receive credit for time served on probation against any sentence of imprisonment imposed after this appeal, we must next consider the calculation of this credit. Facing a similar situation, in which the defendant [*39]  had completed a six-month term of home detention, the Second Circuit explained:

Where, as here, the defendant has served time in home detention that will not be credited toward his new sentence [by the Bureau of Prisons], he has served a portion of the "just punishment for the offense," the served time has provided a

portion of the necessary deterrent, and, if home detention is not taken into account, he will, upon his ultimate release, [**26] have served a longer sentence than would a similarly situated defendant who had been correctly sentenced under the Guidelines in the first instance. Because the Guidelines do not consider these mitigating circumstances, the district court is permitted to depart downward to account for them.

*Carpenter, 320 F.3d at 345*. See also *United States v. Romualdi, 101 F.3d 971, 977 (3d Cir. 1996)*("On remand, the district court may want to consider whether [the six months of home detention already served] is a factor that would warrant departure."); *Miller, 991 F.2d at 554* ("Because the [Sentencing] Commission seems not to have considered the issue of compensating for time erroneously served, the district court [is] free to depart" to account for six months of home detention already served). n22 Other circuit courts have required credit for punishments other than or in addition to probation served under home detention. See *Lominac, 144 F.3d at 317-18* (holding that a court must credit time erroneously served on supervised release against a new sentence of imprisonment); *McMillen, 917 F.2d at 777* (holding [**27] that the district court must fully credit time served on a sentence of probation, including 30 days served in a community confinement center and five months served in home detention).

> n22 In Carpenter, the Second Circuit recognized that failing to credit time served on probation against a new prison sentence "may fall athwart the proscriptions of the *Double Jeopardy Clause of the Fifth Amendment to the Constitution*," but did not address the issue in depth. *320 F.3d 334, 345* & n.10. The courts in *Romualdi* and *Miller* did not address the relationship between crediting probation against imprisonment and double jeopardy.

We agree that the proper means for crediting probation, including home detention, against imprisonment is a downward departure by the district court upon remand. n23 The amount of any departure should depend on the specific conditions of Martin's probation and the effect of a sentence reduction on the underlying purposes of the Guidelines as set out in *18 U.S.C 3553 (a)* [**28] . See *Carpenter, 320 F.3d at 346*. We leave this fact-based inquiry to the judgment of the district court.

> n23 *United States v. Wilson, 503 U.S. 329, 117 L. Ed. 2d 593, 112 S. Ct. 1351 (1992)*, is not to the contrary. In Wilson, the Court ruled that the Attorney General, and not the sentencing court, is responsible for calculating the amount of credit granted to defendants pursuant to *18 U.S.C. § 3585(b)*. Wilson, however, considered only who was authorized to grant the credit specifically prescribed by *§ 3585(b)*. It did not address the crediting required by the constitutional protection against double jeopardy.

We note, however, that "fully crediting" probation against a subsequent sentence of imprisonment, *Pearce, 395 U.S. at 717-18*, does not require a day-to-day offset against time to be served in prison. Time served in home detention is normally far less onerous than imprisonment, and time served on probation without home detention is even [**29] less restrictive of a defendant's freedom. n24 Thus, a sentence on remand that reduced [*40] imprisonment by one day for each day that Martin served in home detention would be too lenient to represent the punishment that Congress intended. See *Carpenter, 320 F.3d at 346*; *Miller, 991 F.2d at 554*. The time Martin served on probation after his period of home detention should reduce any new sentence of imprisonment to an even lesser degree, reflecting its less restrictive conditions. Conversely, a sentence on remand that gave no credit for time served on probation and imposed the maximum term of imprisonment would exceed the maximum punishment allowed by statute, thereby violating the Lange/Bradley line of precedent. Thus, a departure that "fully credits" the time Martin has already served will provide less than one-to-one credit for each day of home detention and probation. n25

> n24 The record shows that Martin's home detention was not particularly onerous. With prior approval from the probation office, he was allowed to leave his home for medical reasons, work, charitable activities, religious observances, family activities, and to attend to any "ordinary necessities." After serving his six months of home detention, Martin has been subject only to the standard terms of probation. [**30]

> n25 Although *U.S.S.G. § 5C1.1(e)(3)* grants "one day of home detention for one day of imprisonment," that section applies only to

sentences in Zones A, B, or C, where the sentencing range can be served in whole or in part as a term of probation or supervised release under the condition of home detention. This policy judgment about the relationship between one day of home detention and one day of imprisonment in Zones A, B, or C, whatever its rationale, does not mean that there must be a similar day-for-day crediting to meet constitutional double jeopardy requirements. The obvious differences in restraint between home detention and imprisonment remain relevant to the constitutional double jeopardy analysis. Moreover, Martin's offense level on remand puts him in Zone D, see infra Part VI, where the guideline sentencing range must be fulfilled by incarceration. Applying a one-to-one ratio would effectively apply the more lenient terms of Zones A, B, or C, allowing Martin to serve probation where the terms of Zone D require imprisonment. Thus, because Zone D does not allow for home detention, the conversion ratio of § 5C1.1(e)(3) is inapplicable to this case by the terms of the Guidelines themselves.

 [**31]

Finally, we hold that a departure on remand based on time already served on probation and home detention does not conflict with recent changes to 18 U.S.C. § 3742. See P.L. 108-21, § 401(e), 117 Stat. 650, 671 (2003). n26 Effective April 30, 2003, § 3742(g) provides that, upon resentencing after appeal, the district court may only depart based on factors that were both approved by the appellate court and that appeared as grounds for departure in the statement of reasons issued after the original sentencing. See supra note 18. Thus, the provision bars new departures on remand. Nevertheless, we hold that § 3742(g) does not prohibit departures necessary to satisfy the double jeopardy crediting requirement. A departure on these grounds can arise, by its very nature, only upon resentencing after appeal, and thus could not have been listed in the original statement of reasons. Such departures do not fit within the purpose of § 3742(g) to "prevent sentencing courts, upon remand, from imposing the same illegal departure on a different theory." H.R. Conf. Rep. No. 108-66, at 59 (2003), reprinted in U.S.C.C.A.N. 683, 694. In this case, rather, the new [**32] departure is necessary to ensure compliance with the protections afforded by the *Double Jeopardy Clause*, and so is permissible. See *United States v. Lauersen, 348 F.3d 329, 344 n.16 (2d Cir. 2003)* (allowing a new departure on remand, despite the mandate of § 3742(g), because "the basis for . . . [the] departure did not exist at Lauersen's initial sentencing").

n26 As a procedural change under the PROTECT Act, this new section applies to all cases pending on April 30, 2003. See infra Part V.B.

We recognize that the possibility of a prison sentence in this case, after [*41] Martin has already served more than one third of his probation, presents an unfortunate circumstance. However, "some sentencing errors under the guidelines are inevitable... [and] increasing a defendant's sentence and confining him in prison is a typical error correction contemplated by the guidelines' structure." *Bogdan, 302 F.3d at 16-17*. Allowing Martin to escape a proper sentence because the district [**33] court chose home detention in lieu of prison would merely compound judicial error. See *United States v. Bozza, 330 U.S. 160, 166-67, 91 L. Ed. 818, 67 S. Ct. 645 (1947)*("The Constitution does not require that sentencing should be a game in which a wrong move by the judge means immunity for the prisoner.").

IV.

We now turn to the district court's decision to group the tax evasion and fraud counts pursuant to *U.S.S.G. § 3D1.2(c)*. n27 The government argues that this grouping was in error, while Martin contends that grouping was proper pursuant to either § 3D1.2(c) or § 3D1.2(d). Because the government objected to the grouping before the district court, we review the court's decision de novo. See *United States v. Phillips, 952 F.2d 591, 594 (1st Cir. 1991)*.

n27 Because offense levels for all nine fraud counts are calculated pursuant to § 2B1.1, the court combined those counts into a single group. Similarly, because the offense levels for the two tax evasion counts are calculated pursuant to § 2T1.1, the court grouped those counts into a second group. See *U.S.S.G. § 3D1.2(d)* ("Offenses covered by the following guidelines are to be grouped under this subsection: § § 2B1.1 . . . 2T1.1. . . ."). These groupings are not contested in this case. The sole grouping question in this case is whether the resulting two groups--one of fraud counts and the other of tax evasion counts--should in turn be grouped together so that all of the counts to which Martin pleaded guilty are included in a single group.

 [**34]

A. Grouping pursuant to *U.S.S.G. § 3D1.2(c)*

*U.S.S.G. § 3D1.2(c)* requires the court to group counts "when one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts." It prevents "double counting" by ensuring that a defendant is not punished, either directly or through an adjustment, for the same underlying offense in separate but "closely related" charges. *U.S.S.G. § 3D1.2 cmt. n.5.* The Guidelines "do not require that all of the conduct be 'fully accounted for'"; rather, "it is enough that conduct 'embodied' in the second offense is 'treated as an adjustment' to the other offense." *United States v. Sedoma, 332 F.3d 20, 27 (1st Cir. 2003).*

In this case, *U.S.S.G. § 2T1.1(b)(1)* required the district court to add two levels to the tax evasion AOL for failure to report criminally derived income. The court believed that this adjustment required grouping pursuant to *§ 3D1.2(c)* because the fraudulent conduct charged in the nine fraud counts--receiving stolen money--embodied the same conduct that was treated in the *§ 2T1.1(b)(1)* adjustment to the tax evasion [**35] charges. The court grouped the counts under *§ 3D1.2(c)* to avoid "double counting" the underlying conduct of fraudulently obtaining income.

The decision to group lowered the final AOL by two levels. When a court groups counts pursuant to *§ 3D1.2(a)-(c)*, as was the case here, the offense level for the group is set, pursuant to *§ 3D1.3*, at the highest AOL of the offenses in the group. n28 [*42] In this case, the AOL for the fraud counts was 20, while the AOL for the tax evasion counts was 18. Thus, the AOL for the group was set at 20. When a court does not group counts, it applies *U.S.S.G. § 3D1.4* to determine the combined offense level. n29 Under that section, the court begins with the highest AOL and then adds levels depending on the other crimes of conviction. Because the tax evasion AOL of 18 is one to four levels less than the fraud AOL of 20, *§ 3D1.4(a)* requires an increase of two levels above the higher AOL, resulting in a final AOL of 22. Thus, the district court's decision to group gave Martin a combined AOL of 20. If the court had not grouped the counts, Martin's combined AOL would have been 22.

n28 See supra note 9.  [**36]

n29 *U.S.S.G. § 3D1.4* provides:

The combined offense level is determined by taking the offense level applicable to the Group with the highest offense level and increasing that offense level by the amount indicated in the following table:

| Number of Units | Increase in Offense Level |
| --- | --- |
| 1 | None |
| 1 1/2 | add 1 level |
| 2 | add 2 levels |
| 2 1/2 - 3 | add 3 levels |
| 3 1/2 - 5 | add 4 levels |
| More than 5 | add 5 levels |

In determining the number of Units for purposes of this section:

(a) Count as one Unit the Group with the highest offense level. Count one additional Unit for each Group that is equally serious or from 1 to 4 levels less serious.

. . . .

The text of *§ 3D1.2(c)*, taken alone, appears to support grouping in this case. Both the fraud counts and the adjustment to the tax evasion AOL refer to the same conduct: the illegal receipt of stolen funds. Thus, the fraud count "embodies conduct that is treated as . . . [an] adjustment to" the tax evasion AOL. *U.S.S.G. § 3D1.2(c).* If we looked no further than the text of the Guidelines, the two counts should perhaps be grouped. [**37]

We must interpret the text of the Guidelines, however, in light of the commentary provided by the Sentencing Commission. "Commentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly

erroneous reading of, that guideline." *Stinson v. United States, 508 U.S. 36, 38, 123 L. Ed. 2d 598, 113 S. Ct. 1913 (1993)*. According to Application Note 5 of the Commentary, the purpose of § 3D1.2(c) is to prevent "'double counting' of offense behavior . . . if the offenses are closely related." *U.S.S.G. § 3D1.2 cmt. n.5*. See also *United States v. Sedoma, 332 F.3d 20, 25-26 (1st Cir. 2003)* (outlining the requirements for grouping pursuant to § 3D1.2(c)). Thus, even when one count embodies conduct treated as an adjustment to a second count, the counts cannot be properly grouped under § 3D1.2(c) unless they are "closely related." n30

> n30 In Sedoma, we wrote that "we must determine whether the conduct embodied in [the first count] is treated as an adjustment to the guideline applicable to [the second count]. If it is, . . . [the adjustment] triggers the applicability of § 3D1.2(c)." *332 F.3d at 25-26*. This analysis, however, is subject to the counts being "closely related" pursuant to *U.S.S.G. § 3D1.2 cmt. n.5*, a point not at issue in Sedoma. Thus, our grouping analysis in *Sedoma* applies only to counts that are "closely related."

[**38]

The fraud counts and tax evasion counts in this case are not "closely related." The two crimes involve different victims: the fraud counts harmed DeMoulas while the tax evasion offenses harmed the United States. They also caused different harms: the fraudulent scheme diverted more than $ 1.8 million from DeMoulas while the failure to report income denied approximately [*43] $ 254,500 to the United States Treasury. Finally, the two counts required different conduct: the fraud counts reflect Martin's efforts to illegally divert funds through a fraudulent scheme while the tax evasion counts reflect his failure to truthfully report his income. Under these circumstances, we conclude that the connection between the two crimes is too tenuous to be deemed "closely related" within the meaning of § 3D1.2 cmt. n.5. n31

> n31 Our holding is in accord with other courts of appeals that have addressed this issue. See, e.g., *United States v. Peterson, 312 F.3d 1300, 1304 (10th Cir. 2002)* ("We are convinced that tax evasion and mail fraud are not closely related because the victims of tax evasion and mail fraud are not the same, the offenses involve distinct behaviors . . . and the harms attributable to each crime are dissimilar."); *Weinberger v. United States, 268 F.3d 346, 355 (6th Cir. 2001)* (refusing to group pursuant to either § 3D1.2(c) or § 3D1.2(d) because the "fraud counts and the tax count consisted of different elements, affected different victims and involved different criminal conduct."); *United States v. Vitale, 159 F.3d 810, 813-14 (3d Cir. 1998)* (refusing to group wire fraud and tax evasion counts pursuant to § 3D1.2(c) because "the counts here involve different victims... different harms and different types of conduct."). We find unconvincing the Fifth Circuit's reasoning in *United States v. Haltom, 113 F.3d 43 (5th Cir. 1997)* (holding that fraud counts should be grouped with tax evasion counts pursuant to § 3D1.2(c)).

[**39]

Moreover, if we permitted grouping in this case, there would be no punishment consequences for the tax evasion conduct. As stated above, the court determines the total offense level of grouped counts by applying *U.S.S.G. § 3D1.3*. In this case, where the AOL for the fraud counts is 20 and the AOL for the tax evasion counts is 18, the total offense level for the group would be 20 -- the same offense level that would apply if Martin had pleaded guilty only to the fraud counts. Thus, after grouping, Martin's AOL would reflect no punishment for tax evasion.

By contrast, because we refuse to group the fraud and tax evasion counts, the Guidelines require us to determine the combined offense level pursuant to *U.S.S.G. § 3D1.4*. Under that section, the fraud AOL of 20 is enhanced by two levels because of the tax evasion counts, resulting in a combined offense level of 22. Thus, Martin's punishment for the tax evasion counts is a two level increase over the offense level he would have received if he had pleaded guilty only to the fraud counts.

This outcome is consistent with an important but simple proposition: one who receives stolen money and fails to report that income in a tax return [**40] is generally more culpable than one who merely receives stolen money. n32 To allow grouping in this circumstance would obscure this difference in culpability. Our decision also finds support in the underlying purpose of § 2T1.1(b)(1). [*44] This subsection increases the punishment for failure to report criminally derived income because "tax offenses, in and of themselves, are serious offenses" and criminally derived income is "generally difficult to establish, so that the tax loss in cases will tend to be substantially understated." *U.S.S.G. § 2T1.1 cmt. background*. Finally, our decision is in accord with the Sentencing Commission's statutory mandate to punish with a term of imprisonment those defendants who derive a substantial part of their income from criminal activity. *28 U.S.C. §*

*994(i)(2)*. By refusing to group in this case, we ensure that Martin receives additional punishment for his tax evasion offense.

> n32 We have previously articulated this principle in *United States v. Lombardi, 5 F.3d 568, 571 (1st Cir. 1993)*, holding that money laundering should not be grouped with underlying fraud counts pursuant to *§ 3D1.2(c)*, because "one who commits a fraud and launders the money (thereby knowing of its source) is normally more culpable than one who merely launders money knowing of its source." *5 F.3d at 571*. The specific holding of Lombardi has been effectively overruled by the 2001 amendments to the Sentencing Guidelines. See *U.S.S.G. § 2S1.1 cmt. n.6* ("In a case in which the defendant is convicted of a count of laundering funds and a count for the underlying offense from which the laundered funds were derived, the counts shall be grouped pursuant to *subsection (c) of § 3D1.2* (Groups of Closely Related Counts)"). However, the explicit instruction to group fraud and money laundering counts, and the absence of any similar instruction to group fraud and tax evasion counts, may demonstrate that the Sentencing Commission does not support a categorical rule requiring courts to group fraud and tax evasion counts.

[**41]

B. Grouping pursuant to *§ 3D1.2(d)*

Martin argues that grouping is still appropriate even if *§ 3D1.2(c)* does not apply because *§ 3D1.2(d)* provides for grouping "when the offense level is determined largely on the basis of the total amount of harm or loss. . . ." Because both the fraud and tax counts require incremental enhancement based on the amount of loss, Martin argues that they must be grouped pursuant to this section.

In addition to requiring that the counts be based on the amount of harm or loss, grouping under *3D1.2(d)* also requires that the offenses be of "the same general type." *U.S.S.G. § 3D1.2 cmt. n.6*. Although the commentary does not describe exactly what factors a court should consider when determining if two offenses are of the same general type, the application notes offer several illustrations: multiple counts of tax evasion are of the "same general type," as are multiple offenses dealing with misappropriated money: larceny, embezzlement, forgery, and fraud. The Guidelines offer no guidance, however, on the relationship between tax evasion and the receipt of stolen money.

In our view, just as fraud and tax evasion counts are not "closely related" within [**42] the meaning of *§ 3D1.2 cmt. n.5*, they are not offenses of the same general type within the meaning of *§ 3D1.2 cmt. n.6*. As noted, the fraud and tax evasion counts cause different harms to different victims and require different conduct on the part of the defendant. Furthermore, while the tables that set the offense levels both increase with the amount of loss, they increase at different increments for tax and fraud offenses. The different increments reflect the different nature of the crimes, basing the offense level for fraud counts on the amount of loss to the victim and the offense level for the tax evasion counts on the tax loss to the government. n33

> N33 In a case like this one, where the defendant did not receive the entire amount of stolen funds, the severity of the tax evasion offense may not increase proportionally with the severity of the fraud offense.

Finally, grouping pursuant to *§ 3D1.2(d)*, like grouping pursuant to *§ 3D1.2(c)*, would result in Martin receiving no punishment for his tax evasion [**43] offense. That outcome would be incompatible with the Guidelines' concept of incremental punishment for each criminal offense. n34 See *28 U.S.C. § 994(l)* ("The Commission shall ensure that the guidelines . . . reflect . . . the appropriateness of imposing an incremental penalty for each offense. . . .").

> n34 In holding that tax and fraud counts should not be grouped pursuant to *§ 3D1.2(d)*, we are in accord with the majority of the circuit courts of appeals to have addressed this issue. See *United States v. Shevi, 345 F.3d 675, 680-81 (8th Cir. 2003)*; *Weinberger v. United States, 268 F.3d 346, 353-355 (6th Cir. 2001)*; *United States v. Lindsay, 184 F.3d 1138, 1142-43 (10th Cir. 1999)*. But see *United States v. Gordon, 291 F.3d 181, 192 (2d Cir. 2002)*.

[*45]

V.

Finally, we turn to the district court's two downward departures: a four level downward departure for extraordinary acceptance of responsibility and a three level downward [**44] departure for extraordinary physical impairment. However, before considering these

departures in detail, we must first address recent changes to our standard of review.

A. Standard of Review

Since the Supreme Court's decision in *Koon v. United States, 518 U.S. 81, 91, 135 L. Ed. 2d 392, 116 S. Ct. 2035 (1996)*, we have applied a three part analysis to the review of departures from the Guidelines: "(1) we determine whether the stated ground for departure is theoretically permissible under the guidelines; (2) if so, we examine the record to assess whether there is adequate factual support; and (3) we determine the appropriateness of the degree of departure." *Bogdan, 302 F.3d at 16*. We conducted part one of this inquiry under a de novo standard and applied Koon's abuse of discretion standard to parts two and three. See *United States v. Thurston, 358 F.3d 51, 70 (1st Cir. 2004)*.

This deferential review process changed on April 30, 2003, when provisions of the Prosecutorial Remedies and Other Tools to End the Exploitation of Children Today Act (PROTECT Act) became effective. Under the PROTECT Act, we still "give due regard to the opportunity of [**45] the district court to judge the credibility of the witnesses, and shall accept the findings of fact of the district court unless they are clearly erroneous. . . ." *18 U.S.C § 3742(e)*. However, we now "review de novo the district court's application of the guidelines to the facts." Id.; see also *Thurston, 358 F.3d at 71*.

De novo review does not allow us to overrule the Sentencing Commission's decisions about what kinds of factors may provide an appropriate basis for departure. "Where the Commission has expressly considered and forbidden or approved (even if discouraged) a particular factor for departure, the court of appeals is bound to accept that determination and cannot revisit it. . . ." *Thurston, 358 F.3d at 75*. Rather, in a case such as this where the court based its departures on factors that the Commission specifically considered, we review de novo only whether the departure "is not justified by the facts of the case." *18 U.S.C. § 3742(e)(3)(B)(iii)*. Nevertheless, in making this judgment, we may "refer[] to the purposes of sentencing, the goals of the guidelines, or other policy considerations [**46] in determining whether, on the facts before the court, a particular defendant fits within a particular categorical 'factor.'" *Thurston, 358 F.3d at 76*.

B. Application of the PROTECT Act

Martin argues that applying the PROTECT Act's de novo standard of review in this case would violate the Supreme Court's retroactivity jurisprudence. At the sentencing hearing, Martin believed that the district court was inclined to depart based on extraordinary acceptance of responsibility. Based on this belief, and the deferential standard of review in place at the time, Martin made the strategic decision not to testify in support of that departure. Martin now argues that this decision created a "settled expectation" in the narrow appellate review in place at the time of his hearing. If he had known that the standard of review would be de novo, he would have testified. He argues that this expectation prevents us from applying the PROTECT Act's de novo standard to his case. We disagree.

[*46] We have recently held that the PROTECT Act's change to the appellate standard of review applies to cases pending when the Act became effective on April 30, 2003. *Thurston, 358 F.3d at 71-72*. [**47] We based this holding on the principle that "the change of a standard of appellate review is one in procedure for the courts; procedural changes that do not affect substantial rights are not usually considered impermissibly retroactive." Id. We further reasoned that:

> The PROTECT Act's alteration of the appellate standard of review upsets no legitimate reliance interest by a defendant; it could not have induced alteration of the behavior that led to the crime. We see no unfairness to defendants in Congress's requiring a closer look by appellate courts at whether a district court committed an error in deciding that the guidelines permitted a departure.

Id. (footnotes omitted). See also *United States v. Mallon, 345 F.3d 943, 946 (7th Cir. 2003)* (applying the de novo standard of review retroactively because "[the PROTECT Act] changes *who* within the federal judiciary makes a particular decision, but not the legal standards for that decision."). Thus, as a procedural change, we must apply the PROTECT Act's new standard of review retroactively, just as we would apply a new procedural change announced by the Supreme Court. *Thurston, 358 F.3d at 71*; [**48] see also *Griffith v. Kentucky, 479 U.S. 314, 322-23, 93 L. Ed. 2d 649, 107 S. Ct. 708 (1987)* ("After we have decided a new rule in the case selected, the integrity of judicial review requires that we apply the rule to all similar cases pending on direct review."); *Derman v. United States, 298 F.3d 34, 39 (1st Cir. 2002)* ("If the conviction is not yet final when the Supreme Court announces the rule, then inferior courts must apply that rule to the defendant's case.").

Martin's belief that his evidence for a departure will not be as persuasive on appeal as it might have been does not change our analysis. We must apply procedural

changes retroactively to all sentences that are not final, even if such application might result in disadvantage to one of the parties. n35 See *Landgraf v. USI Film Prods, 511 U.S. 244, 275 n.28, 128 L. Ed. 2d 229, 114 S. Ct. 1483 (1994)* ("While we have strictly construed the *Ex Post Facto Clause* to prohibit application of new statutes creating or increasing punishments after the fact, we have upheld intervening procedural changes even if application of the new rule operated to a defendant's disadvantage in the particular case."); *Griffith, 479 U.S. at 321-22, 328* [**49] ("[A] new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases . . . not yet final."). However unlikely, each defendant runs the risk that alterations in procedural rules during the adjudicative process, by Congress or the Supreme Court, may change the consequences of tactical trial decisions. n36

> n35 Because Martin's sentence is still subject to appeal, it is not "final" for retroactivity purposes. See *Griffith, 479 U.S. at 321 n.6* ("By 'final' we mean a case in which a judgment of conviction has been rendered, the availability of appeal exhausted, and the time for a petition of certiorari elapsed or a petition for certiorari finally denied.").
>
> n36 The Ninth Circuit recently rejected the argument that a defendant "held a legitimate and reasonable expectation that there would be an established degree of appellate deference to the departure granted by the district court that oversaw his proceedings below." *United States v. Phillips, 356 F.3d 1086, 1099 (9th Cir. 2004)*. In applying the PROTECT Act retroactively, the court wrote: "[The defendant] did not rely upon the former standard of review at the time he committed the crime for which he was convicted. He may have expected that a higher level of deference would be shown to the district court's sentencing determinations, but that fact should have prompted him to present his evidence *more* carefully at trial in the event that the district court's decision was adverse to him." Id. (emphasis in original).

[**50]

[*47]   C. Downward Departure for Extraordinary Acceptance of Responsibility

The district court granted Martin a three level downward adjustment for acceptance of responsibility pursuant to § 3E1.1(a)-(b). It then departed downward an additional four levels for Martin's "extraordinary acceptance of responsibility." In justifying the additional departure, the court stated that

> Mr. Martin, Mr. Dick and Mr. Stella divided up the total amount taken from the DeMoulas enterprises family and paid it back to them. Martin and Dick also divided up McCarthy's share and contributed that share as well as their own. And also there were additional contributions of attorney's fees, and in particular, Martin contributed to the attorney's fees for the DeMoulas family and for Fleet Bank, and, of course, for the DeMoulas enterprises. On those grounds, I will make a downward departure of four levels from 17 to 13.

Thus, the court based its additional departure primarily on the restitution Martin paid to his victims.

Adjustments made pursuant to § 3E1.1 account for pre-trial restitution. *U.S.S.G. § 3E1.1, cmt. n.1(c).* n37 "A departure based on grounds that have already been specifically [**51] considered by the Guidelines . . . will be treated as if the departure were based on a discouraged factor." *Bogdan, 284 F.3d at 328 n.4*. Thus, additional departures based on acceptance of responsibility, including those based on pre-trial restitution, are only appropriate where the factor is present "to a degree substantially in excess of that which ordinarily is involved in the offense." *U.S.S.G. § 5K2.0*; see *United States v. Craven, 239 F.3d 91, 99 (1st Cir. 2001)* ("Downward departures for presentence rehabilitation are hen's-teeth rare, and our precedent makes clear that such departures are to be granted sparingly.").

> n37 *U.S.S.G. § 3E1.1, cmt. n.1* provides:
>
> 1. In determining whether a defendant qualifies [for a decrease in offense level] under subsection (a), appropriate considerations include, but are not limited to, the following:
>
> ...
>
> (c) voluntary payment of restitution prior to adjudication of guilt;

The amount of restitution is a critical factor [**52] in determining whether a defendant's acceptance of

responsibility is extraordinary. Courts have generally not granted departures where the restitution was less than or equal to the amount stolen. See, e.g., *United States v. Hairston, 96 F.3d 102, 109 (4th Cir. 1996)* (holding that the payment of approximately half of the stolen funds after indictment did not take the case out of the 'heartland'); *United States v. Bean, 18 F.3d 1367, 1369 (7th Cir. 1994)* (holding that full restitution of $75,000 fraudulently obtained from a bank did not warrant a departure in excess of that allowed by § 3E1.1). Courts are more willing to entertain the possibility of additional departures when the restitution exceeds the amount taken from the victims. See, e.g., *United States v. Garlich, 951 F.2d 161, 162-63 (8th Cir. 1991)* (remanding to the district court to consider additional departure where the defendant paid $1.4 million in restitution and the court estimated the loss to be only $253,000); *United States v. Lieberman, 971 F.2d 989, 996 (3d Cir. 1992)* (affirming [*48] downward departure where defendant agreed "to pay [**53] about $34,000 more than he thought was owed and to which he pled guilty").

As noted above, Martin paid more than his share of restitution, including part of McCarthy's share and some attorneys' fees. All told, he may have paid almost $270,000 more than he received from the scheme. Nevertheless, Martin, together with Stella and Dick, did not pay the injured parties more than they had lost in the scheme, and hence more than the court could have required under the *Mandatory Victim Restitution Act of 1996* (MVRA). The MVRA virtually assured that Martin would have to pay at least his share of the proceeds as restitution, and the court had authority to make all defendants jointly and severally liable for the full $1.8 million. *18 U.S.C. § 3663A*; *18 U.S.C. § 3664*. Thus, Martin's restitution, while substantial, was not necessarily more than he would have been required to pay by the court. n38

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n38 In this circuit, whether the MVRA authorizes the inclusion of attorneys' fees as part of restitution remains an open question. *United States v. Richard, 234 F.3d 763, 770-71 (1st Cir. 2000)*. Thus, although Martin contends that the $11,000 he paid in attorneys' fees was above what he would otherwise be required to pay in restitution, the court might have required a payment of attorneys' fees under the MVRA. In any case, the court's ability to impose joint and several liability for the entire amount stolen in the scheme makes the attorneys' fees contribution a relatively insignificant amount in calculating whether Martin paid more than he would otherwise have been required to contribute.

[**54]

In addition to amount, the timing of and motivation for restitution are important factors in determining the propriety of a departure. See, e.g., *Miller, 991 F.2d at 553-54* (holding that a departure for extraordinary acceptance of responsibility based on restitution must include "genuinely voluntary" payment not "motivated primarily by . . . a desire to settle [a] civil lawsuit"). When considering departures in the similar category of extraordinary rehabilitation, we have said that "the reason that timing matters in rehabilitation is that a defendant who decides independently to turn his life around likely deserves higher marks than one who undertakes rehabilitation mainly (or at least partially) to gain advantage in imminent criminal proceedings." *Craven, 239 F.3d at 99*. Further, "some degree of pre-sentence rehabilitation is usually to be expected from a penitent defendant. . . . Yet such predictable reactions, while laudable, fall well shy of what we believe is necessary to take cases out of the heartland." *United States v. Sklar, 920 F.2d 107, 116-17 (1st Cir. 1996)*. We believe these principles apply equally to departures [**55] based on extraordinary restitution, and we will usually uphold such departures only where there is evidence of an independent motivation to make the victim whole rather than merely the more common motivation to reduce a sentence when faced with prosecution.

In this case, Martin's payment of restitution came only after the scheme had been discovered and criminal prosecution appeared likely. In a taped telephone conversation after the scheme had unraveled, Martin expressed hope that, by paying back the stolen funds, he and the other participants might avoid a criminal investigation all together. In response, Martin points out that he proceeded with his plan for restitution even after the government asserted that it would not recommend a departure on that basis. Nevertheless, while Martin's desire to make his victims whole may have been sincere, the timing of his change of heart does not suggest the kind of rehabilitation--above and beyond [*49] the penitence shown by most criminals when confronted with their wrongdoing--necessary to warrant a departure for extraordinary acceptance of responsibility. If anything, the timing suggests a rehabilitation caused by the fear of prosecution and a [**56] harsh sentence.

Martin's decision to pay restitution promptly upon being discovered, and to pay more than the amount he claims to have received from the scheme, deserves consideration in the sentencing calculus. Defendants who engage in such behavior should be granted some level of leniency. Martin was granted just that in the form of his three level downward adjustment under § 3E1.1. An extraordinary acceptance of responsibility, however,

requires some action that goes beyond the behavior envisioned by the § 3E1.1 adjustment, moving the case outside the "heartland" of the Guidelines. We find no such action here.

D. Downward Departure for Physical Impairment

"Physical condition . . . is not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range." *U.S.S.G. § 5H1.4*. Thus, departures based on physical condition are discouraged. See *United States v. Rivera, 994 F.2d 942, 948 (1st Cir. 1993)* (listing several factors, including physical impairment, that are discouraged bases for departure). Nevertheless, "an extraordinary physical impairment may be a reason to impose a sentence below the applicable guideline range. [**57] " *U.S.S.G. § 5H1.4*; see also *United States v. Woodward, 277 F.3d 87, 92-93 (1st Cir. 2002)* (recognizing the authority of the district court to depart in the case of an extraordinary physical impairment). A court may find such an extraordinary impairment when imprisonment would threaten or shorten a defendant's life or when the Bureau of Prisons would be unable to adequately meet the defendant's medical needs. See *United States v. LeBlanc, 24 F.3d 340, 348-49 (1st Cir. 1999)* (upholding the district court's refusal to depart because "there was no indication . . . that [defendants's] life would be threatened or shortened by virtue of being incarcerated... [or] that the Bureau of Prisons would be unable to adequately accommodate [defendant's] medical needs.").

In this case, the district court found such extraordinary circumstances:

> Mr. Martin would be unusually susceptible to harm in prison because of his multiple disabilities and indeed would be extremely vulnerable to the risk of death because of an emergency need of medical and surgical attention for his abdominal conditions.

After careful review of the record, we agree with [**58] the district court's decision to depart.

For more than 30 years, Martin has suffered from Crohn's disease, a malady of the small intestine that can cause periodic episodes of obstruction and acute abdominal pain. If these episodes are not treated almost immediately, they can lead to hospitalization and potentially catastrophic surgery. Injection with the narcotic Demerol, which Martin uses for its anti-spasmodic properties, is the only treatment that has successfully combated these attacks. Martin submitted a letter from his gastroenterologist of 31 years stating that "lesser antispasmodics have not been effective. Should this medication [Demerol] not be available to him, he may well progress to full blown small bowel obstruction over the space of 6-12 hours requiring treatment with intravenous fluids . . . and conceivably urgent surgery." The record indicated that the Bureau of Prisons (BOP) would not administer [*50] Demerol to Martin during his incarceration, putting him at risk for a severe episode. n39

> n39 According to an affidavit submitted by Martin from a former Chief U.S. Probation Officer for the District of Massachusetts, the BOP's Health Services Administrator at the Federal Medical Center at Devens, Massachusetts stated that, because Demerol is a narcotic and a controlled substance, it would not be used to control Martin's attacks. In response, the government provided a letter from the Health Services Administrator at the BOP's Northeast Regional Office, stating only that "alternatives to Demoril IM [sic] are available at BOP facilities." At the sentencing hearing, the government stated that the BOP "administers drugs akin to narcotics that are helpful to others with Crohn's disease. . . ." Neither of these assertions by the government contradicts Martin's contention that Demerol would not be available to him while incarcerated.

[**59]

In addition to Crohn's disease, Martin suffers from suppression of his immune system as a result of the continued steroid therapy necessary to treat Crohn's disease. A letter from Martin's internist stated that "in view of his immune suppressive disorder, confinement in a correctional facility . . . places Mr. Martin at unacceptable risk for serious infectious disease." This letter, and others submitted by the defense, describe Martin's osteoporosis and Bell's Palsy--a chronic partial paralysis of his face--and state that he has been hospitalized several times in recent years for various ailments. Martin's internist concludes that "his health at this time is extremely fragile."

In response to this evidence, the prosecution offered two letters from BOP officials that offered an overview of how the BOP assesses the medical needs of prisoners. The first letter described the general process undertaken by the BOP in assigning prisoners to various facilities based on medical need. Although the letter concluded that "the BOP [can] provide for Mr. Martin's medical condition," it provided no more than a cursory discussion of the specific limitations--such as Martin's unresponsiveness to [**60] treatments other than Demerol and his depleted immune system--that might

363 F.3d 25, *; 2004 U.S. App. LEXIS 5847, **;
93 A.F.T.R.2d (RIA) 1553

distinguish Martin from other inmates with Crohn's disease. The second letter outlined the various dietary accommodations that the BOP has undertaken for other inmates suffering from Crohn's disease. It did not, however, specifically address Martin's case. Something more than mere boilerplate language is necessary to assure the court that the BOP can adequately care for Martin given his substantial history of medical difficulty. See *United States v. Gee, 226 F.3d 885, 902 (7th Cir. 2000)*(refusing to credit "a form letter trumpeting the BOP's ability to handle medical conditions of all kinds").

Several serious medical conditions make Martin's health exceptionally fragile. On this record, we are not convinced that the BOP can adequately provide for Martin's medical needs during an extended prison term. There is a high probability that lengthy incarceration will shorten Martin's life span. See *LeBlanc, 24 F.3d at 348-49*; *United States v. Long, 977 F.2d 1264, 1278 (8th Cir. 1992)*(upholding a downward departure where "the imposition of a term of imprisonment could [**61] be the equivalent of a death sentence for [defendant]"). Thus, the district court did not err in departing three levels based on the discouraged factor of extraordinary physical impairment.

VI.

The conclusions we have reached on appeal do not make the difficult sentencing scenario in this case any easier. Because we hold that the district court should not have grouped the fraud counts with the tax evasion counts and that it should not have granted a departure for extraordinary acceptance [*51] of responsibility, the court should begin on remand with an AOL of 19. n40 The court should then apply the three level departure for Martin's extraordinary physical impairment, lowering the AOL to 16. With Martin's Criminal History Category of I, this combination indicates a Guideline Sentencing Range of 21-27 months.

n40 The calculation of the AOL is as follows: The fraud AOL remains 20 while the tax evasion AOL, including an upward adjustment pursuant to § 2T1.1, remains 18. The counts should not be grouped. Thus, pursuant to § 3D1.4, the combined AOL is 22. It is then reduced three levels, pursuant to § 3E1.1, for acceptance of responsibility. Thus, prior to any departures, the combined AOL is 19.

[**62]

Then, to comply with double jeopardy principles, the district court must determine the appropriate level of credit that Martin should receive for the time he has already served on probation, including six months of home detention, and grant a downward departure to provide for that credit. Also, the court may wish to revisit the issue of Martin's extraordinary physical impairment. Because we have overturned the district court's decision to group the fraud and tax evasion counts and its decision to depart for extraordinary acceptance of responsibility, the three level downward departure for extraordinary physical impairment is no longer sufficient to move Martin's AOL into Zone B where he could avoid prison all together. n41 Thus, on remand, the district court may wish to determine whether the original three level departure is adequate to reflect Martin's physical impairment in light of the changed sentencing scenario and any changes in his medical condition since his sentence was first imposed. We want to emphasize, however, that we are not suggesting that a period of incarceration would be inappropriate. See *United States v. Hilton, 946 F.2d 955, 958 (1st Cir. 1991)* [**63] ("If an extraordinary physical impairment is shown to exist, a sentencing court is not faced with an all-or-nothing choice between GSR-range imprisonment or no imprisonment, but may lawfully decide to impose a reduced prison sentence below the GSR.").

n41 See infra note 12. An AOL of 11 or greater would require at least some term of imprisonment. See *U.S.S.G. § 5C1.1(d)*.

For the foregoing reasons, we VACATE the sentence of the district court and REMAND for resentencing consistent with this opinion.

SO ORDERED.